UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

CIVIL ACTION NO. 05-538-GWU

KIMBERLY BURTON,                                                      PLAINTIFF,


VS.                          **MEMORANDUM OPINION**


JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,                         DEFENDANT.

* * * * * * * *

The plaintiff appeals an administrative decision to terminate Social Security

Income (SSI) benefits originally awarded in June, 1992. (Tr. 56). The case is

currently before the Court on cross-motions for summary judgment.

**STANDARDS APPLICABLE TO TERMINATION DECISIONS**

When the issue is the termination of benefits, the regulations establish the

following eight-step test:

1.    Is the beneficiary engaging in substantial gainful
      activity? If so, then the disability will be found to have
      ended. See 20 C.F.R. Section 404.1594(f)(1).

2.    Provided the beneficiary is not engaged in substantial
      gainful activity, does the beneficiary have an impairment
      or combination of impairments which meet or equal the
      severity of impairments in the Listing? If so, then the
      disability must be found to continue. See 20 C.F.R.
      Section 404.1594(f)(2).

1

Burton

3.     If the beneficiary does not equal a listing, then the question is whether
       there has been medical improvement (any decrease in the medical
       severity of one's impairments, as per 20 C.F.R. 404.1594(b)(1)).

4.     Provided medical improvement has occurred, then the question is
       whether this has produced an increase in the residual functional
       capacity. If the improvement is not related to the ability to perform
       work activities, then one proceeds to step 5. If the improvement is
       related work ability, then one proceeds to step 6. See 20 C.F.R.
       Section 404.1594(f)(4).

5.     Provided there has been no medical improvement or the improvement
       is not related to work ability, then one must decide whether an
       exception to the medical improvement standard will apply. If not, then
       a finding of continuing disability should be made. See 20 C.F.R.
       Section 404.1594(f)(5).

6.     If the medical improvement is found to be related to work ability or if
       an exception to the medical improvement standard applies, then one
       considers whether the current impairments in combination are severe.
       If so, then one proceeds to step 7; if not, the beneficiary is no longer
       considered disabled. See 20 C.F.R. Section 404.1594(f)(6).

7.     If the impairments are found to be severe, then one must assess the
       beneficiary's ability to engage in substantial gainful activity in
       accordance with 20 C.F.R. Sec. 404.1561. If found capable of
       performing past relevant work, then the disability will be found to have
       ended. Otherwise, one proceeds to step 8. See 20 C.F.R. Section
       404.1594(f) (7).

8.     Provided the beneficiary cannot perform past relevant work, then one
       must assess the residual functional capacity and considering the age,
       education, and past work experience, determine whether other work
       can be performed. If so, then the beneficiary is no longer disabled.
       Otherwise, a finding of continuing disability should be made. See 20
       C.F.R. Section 404.1594(f)(8).

The standard for judicial review is whether there is substantial evidence to

support the Secretary's decision that the plaintiff's condition has improved to the

2

Burton

extent that he can perform substantial gainful activity. <u>Casiano, Jr. v. Heckler</u>, 746
F. 2d 1144 (6th Cir. 1984). The Court must determine from the record upon what
conditions the claimant was awarded benefits, and whether there has been any
improvement in these conditions. <u>Id</u>. at 1148.

## DISCUSSION

The plaintiff, Kimberly Burton, applied for SSI in 1992, citing nerves, a
depressive disorder and suicidal thoughts (Tr. 39, 115), and was found disabled
because her condition met the Commissioner's Listing of Impairments (LOI) Section
12.04 for an Affective Disorder and LOI Section 12.08 for a Personality Disorder.
(Tr. 349-8). The benefits were continued after a review in 1999 showed no evidence
of medical improvement. (Tr. 359). After another review in 2002, an Administrative
Law Judge (ALJ) concluded that medical improvement had occurred and that her
disability had ceased as of October 2002.  (Tr. 25-7). The plaintiff appeals.

The plaintiff argues initially that she still meets LOI Sections 12.04 and 12.08
and that the Commissioner failed to show medical improvement since the most
recent favorable decision in 1999.  At that time, Psychologist Anne Shurling
conducted an examination in which the plaintiff was said to have a disturbed
orientation, an anxious mood and affect, and was preoccupied with previous abuse.
(Tr. 296-9).  Dr. Shurling, who also reviewed records of previous psychiatric
treatment (e.g., Tr. 180-3), diagnosed post traumatic stress disorder (PTSD), a
major depressive disorder, borderline intellectual functioning vs. mild mental

3

retardation, "rule out" a panic disorder, and a personality disorder with borderline and antisocial traits. (Tr. 301). Dr. Shurling concluded that the plaintiff was not able to sustain attention to perform repetitive tasks, get along with others in a productive manner, or tolerate stress in a day-to-day work environment. (Id.).

There is no evidence that the plaintiff received specific mental health treatment between 1999 and October, 2002. She sought treatment between January and September 2002 from a neurologist, Dr. Peter W. Pick. As part of his treatment, from which the plaintiff was eventually dismissed for drug-seeking behavior (Tr. 320-1), Dr. Pick recorded two mental status evaluations which showed no abnormalities in affect, no evidence of depression, despite the plaintiff's statements that she was depressed and anxious, and essentially no other abnormalities. (Tr. 323, 330). His impression was only of "mild chronic depression and anxiety." (Tr. 323, 331, 332, 337). He stated in a report for the state disability determination section that the plaintiff's mental status was normal, and that she had "normal" understanding, memory, and ability to sustain concentration and persistence, "good" social interaction skills, and should have a "fair" ability to adapt, limited only by chronic back and bilateral lower extremity pain. (Tr. 333).

A state agency physician reviewed the evidence from Dr. Pick and concluded that the plaintiff no longer had a "severe" impairment. (Tr. 360). The psychologist, Dr. Ed Ross, who had determined that the plaintiff met LOI Sections 12.04 and 12.08 in 1992 (Tr. 349) noted that her treating neurologist had performed

4

intermittent mental status examinations and his medical source statement was to be given controlling weight, given the plaintiff's compromised credibility. (Tr. 372).

A consultative psychological examination was conducted by Dr. Blaine Pinaire in February, 2003, at which the plaintiff alleged continuing disability due to nerves, depression, panic attacks, and anxiety. (Tr. 344). Dr. Pinaire described the plaintiff as frenetic and hyperactive, but he was able to obtain a history and information about activities of daily living, although the mental status evaluation was not fully completed because the plaintiff complained of nausea and ran to the bathroom twice. (Id.). Dr. Pinaire reviewed Dr. Shurling's previous examination, as well as records from Family Practice Physician Allan Grimball, who had treated the plaintiff between April and June, 2002, and had discharged her after a urine drug screen was positive for cocaine and negative for the Xanax which he had prescribed. (Tr. 304). Dr. Pinaire described the plaintiff as a poor historian at best and "at worst may be misrepresenting her history and problems," noting that she denied substance abuse but his impression was that it could not be ruled out. (Tr. 345). He concluded that the plaintiff appeared to be psychologically disturbed but, based on his interview, it could not be determined which psychiatric descriptions applied other than borderline personality disorder, a mood disorder, and provisional diagnoses of borderline intellectual functioning and polysubstance dependence. (Tr. 346). He felt that the plaintiff had a poor prognosis and the current examination showed that she was not able to sustain the necessary concentration and

5

persistence to complete tasks in normal amounts of time, not able to interact socially with friends, supervisors, and the public, and not able to adapt to respond pressures normally found in day-to-day work settings. (Id.).

Another state agency psychologist, Dr. Ilze Sillers, reviewed the record at this point and affirmed the previous opinion that the plaintiff no longer had a "severe" mental impairment. (Tr. 376, 388). She noted that the plaintiff was not credible at the recent consultative examination. (Tr 388).

The plaintiff's most recent family practitioner, Dr. D. E. Littell, submitted a medical source statement indicating that she would have no useful ability to remember locations and work-like procedures, understand and remember even short and simple instructions, work with or near others without being distracted by them, complete a normal workday or workweek, perform at a consistent pace, or travel in unfamiliar places or use public transportation. (Tr. 408-9). The reason given for his conclusions was the plaintiff's "failure to follow simple requests in office." (Tr. 408). Upon further inquiry, Dr. Littell responded that he had started decreasing the plaintiff's pain medications in January, 2004 after a drug screen showed cocaine, and he believed that the plaintiff was probably selling her pain medication to buy cocaine. (Tr. 489). Apparently, on January 24, 2004, after Dr. Littell declined to give the plaintiff any more narcotics, she walked out of his office with her chart, which he did not get back until March, 2004 after writing her a letter "telling her of the trouble she was in because she had taken her chart." (Id.). His

6

ratings in the mental source statement was based on the fact that she knew her behavior in taking the chart was inappropriate. (Id.). No other reasons were given.

A psychological medical expert, Neil Lewis, testified at the May 14, 2004 administrative hearing. Dr. Lewis stated that the plaintiff's fundamental underlying diagnosis up until June, 1999 was a personality disorder, which explained all of her other problems. (Tr. 510). He believed that, since Dr. Shurling's examination in June 1999, the record described remission of symptoms. (Id.). Essentially, her record since that time described substance dependence, as shown in the records of Dr. Pick, and he did not believe that the plaintiff was at a Listing level from June, 1999 forward. (Tr. 510-11). Nor did Dr. Lewis believe that the plaintiff had a disabling combination of impairments. (Tr. 511). He discounted Dr. Pinaire's report, in part, because of Dr. Pinaire's statement that the plaintiff might be misrepresenting herself, and stated that he did not give Dr. Pinaire very much weight both because of the "credibility issue" and the fact that he rated the plaintiff as being much worse than her treating source, Dr. Pick. (Tr. 513-15). He believed that the record did not support Dr. Littell's severe restrictions. (Tr. 520). Dr. Lewis concluded that the plaintiff would be able to carry out simple, repetitive jobs or tasks or 1-2 step instructions, would have a mild impairment at the most in her ability to relate to co-workers, supervisors, or the public, would work better in an object-focused setting rather than having to deal with people, and would have a moderate impairment in her ability to adapt and respond to pressures in a day-to-day work setting. (Tr. 518-

7

19). On further examination, Dr. Lewis accepted that he did not believe that a personality disorder would go away, that the plaintiff was both anxious and depressed, and that taking Dr. Pinaire's report at face value would indicate that the plaintiff would be close to meeting LOI Section 12.08 and that there had not been any improvement since 1999. (Tr. 521-7).

The ALJ declined to accept Dr. Pinaire's report at face value because to do so would ignore the record as a whole, including the plaintiff's drug-seeking behavior. (Tr. 18). While the plaintiff challenges this conclusion on appeal, noting that the plaintiff's family doctors and neurologist were treating her for back pain and not for psychological problems, the fact remains that Dr. Pick was a treating source who did conduct mental status examinations, noted virtually no abnormalities, and specifically stated that the plaintiff would have no mental impairments. In combination with the testimony of Dr. Lewis, substantial evidence supports the ALJ's conclusion of medical improvement.

The plaintiff's other argument on appeal is that vocational testimony was insufficient to establish that there was a significant number of jobs existing in the economy which she could perform. The Court agrees.

The ALJ determined that the plaintiff currently had "severe" impairments consisting of scoliosis, borderline intellectual functioning, a personality disorder, and a history of polysubstance dependence. (Tr. 18). Nevertheless, after questioning a vocational expert (VE), the ALJ determined that the plaintiff retained the residual

8

functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits. (Tr. 24-7).

At the first of two administrative hearings in 2004, the ALJ had asked the VE whether a person of the plaintiff's age, education, and work experience could perform any jobs if she were limited to "light" level exertion, and would also have the following limitations. (Tr. 528). She: (1) could sit and stand at least six hours in an eight-hour day, but no longer than 30 minutes at a time; and (2) would be restricted to simple, repetitive 1-2 step tasks in object-focused settings without public contact and with only casual contact with co-workers. (Tr. 528-9). The VE responded that such a person could perform the jobs such as hand packer, production inspector, and "assembly type work," and proceeded to give the numbers in which they existed in the state and national economies. (Tr. 529).

On further examination by the attorney for the plaintiff, the VE stated that he believed a person who was capable of following simple, 1-2 step instructions would be able to perform the jobs he had enumerated because they were "entry-level jobs" with "SVPs" of one or two. (Tr. 531).[1] Asked if he was familiar with the definitions of the "reasoning levels" given in the Dictionary of Occupational Titles (DOT), the VE responded that "reasoning level 1" (R-1) was defined as the "ability to apply

[1]Specific vocational preparation (SVP) is defined in the Dictionary of Occupational Titles (DOT) as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C.

9

commonsense understanding to carry out simple one or two step instructions, deal with standardized situations with occasional or no variables in or from the situations encountered on the job." (Tr. 531). See DOT, Appendix C. "Reasoning level 2" (R-2) was the ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and to deal with problems involving a few concrete variables in or from standardized situations." (Tr. 531-2). After giving these definitions, the VE appeared to agree that an individual restricted to simple, 1-2 step instructions would be restricted to jobs only at reasoning level 1. (Tr. 532). The ALJ than stated that "I take administrative notice that if any of these hand packer, inspector or assembler jobs are above reasoning level 1, they would not be consistent with the hypothetical question [;s]o the issue is how many of the numbers cited of packers, inspectors, assemblers, is less than the numbers we've been given...." (Id.). The VE stated that he did not have the information available to testify how many of the 650,000 hand packer jobs at the light level (which he had previously identified) would be at reasoning level 1. (Tr. 532-3). On further questioning, the VE stated that he believed that there would be "a lot of" sedentary assembler jobs at R-1, but could not give any numbers. (Tr. 534-6).

The ALJ thereupon requested that the VE "track down roughly how many of those specific jobs would exist in the region and/or the nation....[p]ick out the packers, inspectors, and assemblers and tell us how many of them there are, if you can." (Tr. 537).

10

Burton

Subsequently, the VE submitted a memorandum to the ALJ reporting that several jobs, including button notion assembler, bench hand assembler, and final assembler, had "sedentary exertional levels and an R-1 rating." (Tr. 436). He appeared to indicate that job numbers were only available for the composite job of assembler, not for specific titles, and that of the 500,000 sedentary assembly jobs in the nation, "[I] still feel there would be at least half of these jobs available and fit the hypothetical you gave me." (Id.).[2]

At the second administrative hearing, after the ALJ restated the hypothetical question, the VE testified that it was still his opinion that the occupations of hand packer, inspector, and assembler could be performed. (Tr. 571). The VE admitted that he did not know how many bench assembler and final assembler jobs existed at the R-1 level. (Tr. 573). He stated that his sources told him that there was "no way" that they could break down exactly how many jobs there were, adding "I cannot tell you there's 2,500 bench hands, or 2,500 final assemblers with an R-1[; t]here's just no way I can give you a number on that, Your Honor." (Tr. 574). His statement that at least half of the 500,000 national sedentary assembler jobs would fit the hypothetical was just "an assumption." (Id.). He added, "I'm just assuming it would be half one and half this, since there's no way I can find out the exact numbers." (Tr. 575).

---

[2]He added that he believed that jobs at R-2 would fit the hypothetical question, in contrast to the ALJ's specific finding to the contrary at the hearing.

11

Burton

As the plaintiff points out on appeal, the VE effectively failed to provide more than a "guesstimate" to meet the Commissioner's burden of proof that a significant number of jobs existed in the economy for a person of her restrictions. Accordingly, a remand will be required in order to obtain additional vocational testimony on this point.

The decision will be remanded for further consideration.

This the _29_ day of September, 2006.

_G. WIX UNTHANK_
G. WIX UNTHANK
SENIOR JUDGE

12